HILL et al. v. McQUEEN.

No. 33912.    Feb. 27, 1951.

Rehearing Denied April 10, 1951.

Second Petition for Rehearing
Denied May 1, 1951.

*230 P. 2d 483.*

Simons, Simons, Mitchell & Headrick, Enid, for plaintiffs in error.

Maurice F. Ellison, Tulsa, and Elam & Crowley, Enid, for defendant in error.

GIBSON, J. This action was brought by defendant in error, McQueen, against plaintiffs in error, L. C. Hill and Johnston Seed Company, a partnership, and the members thereof, to recover damages for personal injuries received in an assault and battery committed upon McQueen's person by Hill. Johnston Seed Company was engaged in the business of selling farm and garden seeds with its principal place of business at Enid, Oklahoma. Hill was its general manager and as such was authorized to make collections of indebtedness to the company. During 1944 and part of 1945 McQueen occupied a contractual relation with the company under which he would go into producing areas, assemble seeds and ship same to the company which would process the seed, sell and make distribution thereof. The relationship was severed in the year 1945, and, on a tentative or final settlement of accounts, McQueen executed his note to the company for approximately $4,800. It was the question of the balance, if any, owing upon the note that occasioned the argument out of which the assault arose. The assault occurred on January 17, 1946, at the close of a meeting of Oklahoma Seedmen's Association held in Oklahoma City. McQueen was the secretary of the association and Hill, who attended the meeting as the representative of Johnston Seed Company, was elected president of the association. After the close of the meeting Hill approached McQueen and told him that the president of the Seed Company wanted him (Hill) to talk to him (McQueen) about the balance due on the note and to learn what he (McQueen) was going to do about it. McQueen told Hill that he had turned the matter over to one Ellison, his attorney, and that any further talk would have to be with his attorney. Angry words ensued, culminating in the assault. There is a conflict in the evidence as to who struck the first blow and as to the use of opprobrious language. On the trial of the action, the jury rendered a verdict for plaintiff in the sum of $7,500 against both defendants and the court awarded judgment thereon.

Johnston Seed Company first assigns error of court in overruling its motion for a directed verdict upon the ground that the commission of the assault was without the scope of Hill's authority as its agent.

In order to hold one responsible for the tort of another, it must be made to appear by competent evidence not only that the relation of principal and agent existed but that the tortious act was committed in the course of the employment. Fairmont Creamery Co. v. Carsten et al., 175 Okla. 592, 55 P. 2d 757; Crews v. Garber, 181 Okla. 373, 73 P. 2d 855.

Herein the fact of the agency is established and the question in issue is whether, in contemplation of law, the assault was committed within the scope of the agent's authority.

Pertinent thereto there is said in Cooley on Torts (3rd Ed.) vol. 2, p. 1037:

"It is not, as a general rule, within the scope of the servant's employment to commit an assault upon a third person and the master is not liable for such an assault, though committed while the servant was about his master's business."

And as examples where the employer was held responsible for assaults committed by the agent, there is further said in the same paragraph:

" . . . But where a bar keeper assaulted a customer in order to collect pay for drinks, the master was held liable. So when the assault is made to protect the master's property from trespass or spoliation being at the time committed. And so in case of an assault upon passengers to whom the master owes the duty of safe carriage."

The basis of the liability that obtained in such cases has been recognized by this court in Ada-Konawa Bridge Co. v. Cargo, 163 Okla. 122, 21 P. 2d 1, where the employer was held liable to one who, while crossing a toll bridge, was shot by a servant who was employed to collect the tolls. And in Chicago, R. I. & P. Ry. Co. v. Radford, 36 Okla. 657, 129 P. 834, where the train auditor caused the arrest of a passenger refusing to pay the required fare. As expressive of the doctrine applied, we approved the following statement made in Dixon v. Northern Pac. Ry. Co., 37 Wash. 310, 79 P. 943:

" . . . It is well settled generally that a railroad company is responsible in damages to a trespasser for torts committed upon him by a servant who, in the commission of the tort, is acting in the line of his employment and within the scope of his authority; not within the scope of his authority as applied to the commission of the tort, for no authority for such commission could be conferred, but within the scope of his authority to rightfully do the particular thing which he did do in a wrongful manner."

The authority of the servant in each of those cases differs both in character and degree from that which obtained in the instant case. The payment of the toll in the one case and the fare in the other was a condition precedent to the enjoyment of a right or privilege. The duty of the employee in substance was to get the toll or fare or to withhold the enjoyment of the right or privilege. Successful performance involved immediate action of some kind in opposition to the will of the other and therefore was to be anticipated by the employer.

No such action can properly be contemplated as an incident to the exercise of ordinary authority to collect indebtedness. And, in absence of some additional authority contemplating extraordinary action, there exists no basis for holding such extraordinary action to be within the scope of the servant's authority. The question here involved was also considered by the Washington court in Manza Matsuda v. Jennie H. Hammond, etc., 77 Wash. 120, 137 P. 328, 51 L.R.A. (N.S.) 920, and the same is annotated in the L.R.A. Report. In the reported case defendant in error operated a mercantile establishment and one Bell was the manager in charge thereof. Manza Matsuda, a regular customer whose rule was to pay cash for his purchases, purchased and took from the store a crate of strawberries. Bell, believing that payment therefor had not been made, instructed his delivery man to call on the purchaser the evening of the same day and demand the price thereof. The delivery man made the demand and reported that the purchaser refused upon the ground that he paid the price at the time of the purchase. On the following day Bell called upon the purchaser in order to collect what he considered to be owing. A dispute arose over the matter of the payment, abusive language was used, and Bell struck the purchaser in the face with his fist, breaking his nose. There is said in the opinion:

". . . The authority of Bell as shown in the record was to act as general manager of Mrs. Hammond's business. This grant of authority would unquestionably authorize Bell to make collections for goods sold from her place of business, and to exact settlements for goods wrongfully taken therefrom, but it would not, without something more, render her liable for unlawful acts of Bell committed while making such collections or settlements. An employer is liable for the unlawful and criminal acts of his employee only when he directly authorizes them, or ratifies them when committed, or, perhaps, continues an employee in his employment after he has knowledge that the employee has committed, or is liable to commit, unlawful acts while in the pursuit of his employer's business. The liability does not arise from a mere contract of employment to do a legitimate and lawful act."

Among the cases therein cited, as supporting the conclusion, is Collette v. Rebori, 107 Mo. App. 711, 82 S.W. 552, from which there is quoted the following:

"The best considered cases hold that the master is liable to third persons for the negligent, fraudulent or tortious acts of his agent or servant when it is shown that the agent or servant was acting within the scope of his employment and that the act complained of was done as a means or for the purpose of doing the work assigned him by the master. To assault and beat a debtor is not a recognized or usual means resorted to for the collection of a debt, nor is it one likely to bring about a settlement of a disputed account."

The only authority of Hill on the occasion of the assault, other than that to collect which was an incident of his office as manager, was the direction of the president of the company that he inquire of McQueen about the indebtedness. We deem it to be clear that in committing the assault Hill was acting without the scope of his employment and, therefore, that the court erred in not sustaining the motion for a directed verdict.

Among the errors assigned by Hill is the action of the court in summarily denying a request of the jury that depositions in evidence be sent to the jury room.

The situation appears to be clearly reflected in the following statement and quotation from the record made in Hill's brief:

"The Defendants didn't learn until after the verdict had been returned, that while the jury was out deliberating on their verdict, they had requested they be furnished with certain depositions to read the same. We were informed the jury wanted one or more of the depositions offered by the defendants. On the hearing of the motions for a new trial, we called this to the Court's attention and the Court made the following comments (C.M. 384):

" 'The Court: Let the minutes show that after the jury retired to consider its verdict a request was made to the Court by the bailiff, in which the jury asked that some depositions be sent to the jury room for consideration of the jury. No request was made by the jury that the evidence be read to the jury in the Court room in the presence of the attorneys.

" 'The Court refused that request and based it upon a decision to the effect that the matter of taking exhibits to the jury room is not good practice for the reason stated the Court denied the request that the depositions of the parties be sent to the jury room, for the further reason it tends to amplify or stress that particular evidence in the minds of the jurors.'

"Of course we never had a chance to make a proper record of this, to make a request or take exceptions to the action of the Court, but we assert the Court committed error in refusing such request."

Since we think that the error appears in the quoted order, and therefore upon the record proper, the appeal therefrom is proper though no motion for a new trial thereon was filed nor exception taken thereto. Pure Oil Co. et al. v. Quarles et al., 183 Okla. 418, 82 P. 2d 970; Leonard v. Tulsa Building & Loan Ass'n et al., 184 Okla. 558, 88 P. 2d 875.

There were in evidence on behalf of plaintiff the depositions of two eye specialists who had treated plaintiff for the injury received. On behalf of defendants there were in evidence the depositions of three persons who were eyewitnesses to the altercation. Defendants urge that the testimony of the latter deponents was material to a vital issue in the case and that the court was under obligation to grant the request, at least to the extent of having the depositions, or the part thereof desired, read to the jury in the courtroom. It is also urged that it was error for the court to dispose of the request in absence of counsel and of an opportunity for them to be heard thereon.

398

For response plaintiff contends that it was purely an assumption that the jury called for the depositions of defendants, and, further, that if the jury felt really concerned they would have made a request to be taken before the court.

There does not appear which of the depositions were desired nor the reason given therefor. And we conclude from the statement of the court that each of such facts was unimportant for the purpose of the ruling.

The pertinent statute, 12 O.S. 1941 §582, reads:

"After the jury had retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court, where the information on the point of law shall be given in writing, and the court may give its recollections as to the testimony on the point in dispute, or cause the same to be read by the stenographer in the presence of, or after notice to, the parties, or their counsel."

The declared purpose of the statute is that the jury be further informed where there is disagreement between them as to the testimony or they wish to be advised concerning the law. The method prescribed for obtaining the information is not designed as an abridgement of the jury's right to the information, but of the method for the exercise thereof, of which it is contemplated they would be advised by the trial court.

For the purpose of our review we consider it probable at the least that the jury in making their request were desirous of reconciling a disagreement between them as to the testimony, and therefore it was incumbent upon the court to consider the request on the basis of its merits and to that end to advise the jury of the method to be pursued in order to accomplish it. The record indicates affirmatively that the request was ignored. Such is prejudicial to an enjoyment of the right of trial and constitutes reversible error.

There are other assignments presented but since they need not be involved on another trial we do not determine the same.

The judgment is reversed and cause remanded for further proceedings not inconsistent with the views herein expressed.

WELCH, DAVISON, JOHNSON, and O'NEAL, JJ., concur.

LUTTRELL, V. C. J., concurs in the reversal of the judgment against Johnston Seed Company, and dissents to the reversal as to the plaintiff in error L. C. Hill.

CORN and HALLEY, JJ., dissent.